**MANHATTAN TELECOMMUNICA-TIONS CORPORATION, INC. d/b/a Metropolitan Telecommunications a/k/a MetTel, Plaintiff,**

v.

**DIALAMERICA MARKETING, INC., Art Conway, Frank Conway, and John Redinger, Defendants.**

**No. 01 CIV. 1342(SAS).**

United States District Court, S.D. New York.

July 31, 2001.

Joshua D. Rievman, Sheryl B. Galler, Hoguet Newman & Regal, LLP, New York City, for Plaintiff.

Jeffrey M. Garrod, Michael S. Haratz, Orloff, Lowenbach, Stifelman & Siegel, P.A., Roseland, NJ, for Defendants.

## *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Manhattan Telecommunications Corporation, Inc. d/b/a Metropolitan Telecommunications a/k/a MetTel ("MetTel") brings this action against DialAmerica Marketing, Inc. ("DialAmerica"), Art Conway, Frank Conway, and John Redinger (collectively, "Individual Defendants"), seeking to recover damages it suffered as a result of defendants' alleged fraudulent billing scheme. Plaintiff asserts three claims, only one of which arises under federal law. Specifically, plaintiff contends that defendants have engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*[1] Plaintiff also asserts pendent state law claims for common law fraud and breach of contract. Defendants now move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). For the reasons stated below, defendants' motion to dismiss is granted pursuant to Rules 12(b)(6) and 12(b)(1).

## I. BACKGROUND

MetTel is a leading integrated communications provider that focuses on delivering voice and data services to the residential and business markets. *See* Amended Complaint ("Am.Compl.") ¶¶ 5, 10. In November 1998, MetTel commenced negotiations with DialAmerica, a provider of telemarketing services.[2] *See id.* ¶¶ 6, 12. Over the course of these negotiations, Frank Conway, an Account Executive for DialAmerica, represented that DialAmerica would bill MetTel only for the hours that DialAmerica's teleservice representatives ("TSRs") were actually engaged in telephone sales for MetTel; would not charge MetTel for training its TSRs; and would charge MetTel a flat rate of $27 per hour per TSR. *See id.* ¶¶ 14, 15, 16.

In reliance on Frank Conway's oral representations, MetTel entered into an agreement with DialAmerica for telemarketing services. *See id.* ¶ 17. However, no agreement was memorialized until approximately four months later, on April 5, 1999. *See id.* ¶ 22.

In early December 1998, DialAmerica began performing telemarketing services for MetTel. *See id.* ¶ 20. Each day, DialAmerica would transmit reports to MetTel via electronic mail showing the number of hours worked by DialAmerica's TSRs. *See id.* ¶ 25. DialAmerica also mailed monthly invoices to MetTel. *See id.* ¶ 26. Between December 1998 and September 2000, Met-

---

1. Federal jurisdiction is based on 28 U.S.C. § 1331, federal question jurisdiction, and 18 U.S.C. § 1964, which authorizes federal courts to hear RICO suits. There is no assertion of diversity jurisdiction.

2. Both MetTel and DialAmerica are Delaware corporations. *See* Am. Compl. ¶¶ 5, 6. MetTel's principal place of business is in New York and DialAmerica's principal place of business is in New Jersey. *See id.* ¶ 6.

Tel paid in excess of $2.6 million to DialAmerica for its telemarketing services. *See id.* ¶ 27.

In mid-October 2000, MetTel discovered, during a visit to one of DialAmerica's service centers, that DialAmerica's TSRs worked fewer hours than shown on DialAmerica's reports and invoices. *See id.* ¶¶ 32–33. On November 3, 2000, following MetTel's complaints to DialAmerica, "Frank Conway finally admitted that DialAmerica, together with and through the Individual Defendants, in the regular course of conducting its business, adds hours to the bills of customers who pay hourly rates in order to cover costs such as TSRs' breaks and ... training." *Id.* ¶ 36. Redinger, Frank Conway's supervisor, later admitted to the same practice of overbilling clients. *See id.* ¶¶ 9, 48. Art Conway, DialAmerica's president and controlling shareholder, is alleged to direct and control DialAmerica's fraudulent billing practices. *See* RICO Statement ¶ 6(c).[3]

Plaintiff filed its complaint on February 23, 2001. The Amended Complaint and RICO Statement were filed on March 15, 2001. In Claim I of the Amended Complaint, plaintiff pleads a RICO claim under 18 U.S.C. § 1962(c) ("section 1962(c)"). Plaintiff maintains that all of the defendants were employed by or associated with an enterprise consisting of DialAmerica, MetTel and other unnamed DialAmerica customers who pay hourly rates to DialAmerica. *See* Am. Compl. ¶ 53. Furthermore, plaintiff alleges that by their fraudulent billing scheme, defendants conducted or participated in the affairs of the alleged enterprise through a pattern of racketeering activity consisting of mail and wire fraud. *See id.* ¶ 54. In Claim II for common law fraud against DialAmerica and

Frank Conway, plaintiff asserts that Frank Conway, on behalf of DialAmerica, made knowingly false representations with the intent to deceive MetTel into contracting with DialAmerica. *See id.* ¶¶ 63–72. Finally, Claim III charges DialAmerica with breach of contract. *See id.* ¶¶ 73–81.

## II. LEGAL STANDARD

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999); *see also Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) ("The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (quotation marks and citation omitted). To properly rule on a 12(b)(6) motion, the Court must accept as true all material facts alleged in the complaint and draw all reasonable inferences therefrom in the nonmovant's favor. *See Harris*, 186 F.3d at 247. However, "bald assertions and conclusions of law will not suffice" to defeat even the liberal standard applied to a Rule 12(b)(6) motion. *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir.2000).

## III. DISCUSSION

### A. The RICO Claim

■ To properly state a RICO claim for damages under section 1962(c), a plaintiff must allege: (1) a violation of the RICO statute; (2) an injury to business or property; and (3) that the injury was caused by the RICO violation. *See De Falco v. Ber-*

---

**3.** For purposes of a motion to dismiss, the RICO Statement is deemed to be part of the

complaint. *See Goldfine v. Sichenzia*, 118 F.Supp.2d 392, 396 (S.D.N.Y.2000).

*nas,* 244 F.3d 286, 305 (2d Cir.2001). Section 1962(c) makes it unlawful

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

18 U.S.C. § 1962(c).

To allege a violation of section 1962(c), "a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229, 242 (2d Cir.1999). The requirements of section 1962(c) must be sufficiently alleged as to each defendant. *See De Falco,* 244 F.3d at 306.

In considering civil RICO claims, a court must be mindful of the devastating effect such claims may have on defendants. *See Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 655 (S.D.N.Y.1996) ("Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device.") (quotation marks and citation omitted). " 'Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.' " *Allen v. New World Coffee, Inc.,* No. 00 Civ. 2610, 2001 WL 293683, at *3 (S.D.N.Y. Mar. 27, 2001) (quoting *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346 (S.D.N.Y.1998) (quotation marks omitted)). "[C]ourts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb." *Schmidt,* 16 F.Supp.2d at 346 (quotation marks omitted).

Defendants contend that MetTel has not adequately alleged a violation of section 1962(c) for three reasons: (1) the pleading of an alleged enterprise is legally flawed; (2) defendants' control of the conduct of the enterprise has not been adequately pled; and (3) plaintiff cannot show a pattern of racketeering activity because its claims of fraud fail as a matter of law.

### 1. Enterprise—General Principles

■ Section 1961 of Title 18 defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This language demonstrates that Congress sought to define the term enterprise "as broadly as possible", including within the definition both a legal entity and a group of individuals that comprise an "association in fact". *United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.1989) (citation omitted). The definition of an enterprise, however, is not without limits. An enterprise must be "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

■ To adequately allege the existence of an enterprise, the enterprise must be supported by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.; see also De Falco,* 244 F.3d at 307. Where the plaintiff alleges an association-in-fact enterprise, rather than a legal entity, a court "must look to the hierarchy, organization, and activities of the association." *Schmidt,* 16 F.Supp.2d at 349 (quotation marks and citation omitted). The RICO enterprise "must exhibit structural continuity which exists where there is an orga-

nizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis." *Pavlov v. Bank of New York*, 135 F.Supp.2d 426, 430 (S.D.N.Y.2001) (quotation marks and citations omitted).

■ In addition, the RICO "enterprise" must be distinct from the RICO "person"—that is to say, the enterprise cannot merely consist of the named defendants. *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir.1996). The Supreme Court recently reaffirmed that principle in *Cedric Kushner Promotions, Ltd. v. King*, 531 U.S. 1050, ——, 121 S.Ct. 2087, 2090, 150 L.Ed.2d 198 (2001), where the Court stated:

> We do not quarrel with the basic principle that to establish liability under [section] 1962(c) one must allege and prove the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name. The statute's language, read as ordinary English, suggests that principle. The Act says that it applies to "person[s]" who are "employed by or associated with" the "enterprise." In ordinary English one speaks of employing, being employed by, or associating with others, not oneself. In addition, the Act's purposes are consistent with that principle. Whether the Act seeks to prevent a person from victimizing, say, a small business, or to prevent a person from using a corporation for criminal purposes, the person and the victim, or the person and the tool, are different entities, not the same.

*Id.* at 2090 (citations omitted). *See also Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (stating that liability "depends on showing that the defendants conducted or participated in the conduct of the *'enterprise's*

affairs,' not just their *own* affairs.") (emphasis in original).

■ A plaintiff may not circumvent this "distinctness" requirement "by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant . . . ." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir.1994) (holding that the activities of two loan officers acting within the scope of their authority could not subject them to RICO liability for conducting the affairs of the alleged enterprise-bank). However, a corporate entity may be held liable as a RICO person "where it associates with others to form an enterprise that is sufficiently distinct from itself." *Id.; see also Cullen v. Margiotta*, 811 F.2d 698, 730 (2d Cir.1987) (stating that a defendant may be a "RICO 'person' and one of a number of members of the RICO 'enterprise' ").

### 2. Application

■ MetTel alleges an association-in-fact enterprise consisting of DialAmerica, MetTel, and other unnamed customers who contracted to pay hourly rates to DialAmerica. As alleged in the RICO Statement, "[t]he usual and daily activities of the enterprise are DialAmerica's performance of telemarketing services on behalf of its customers including MetTel and billing its customers for those activities." RICO Statement ¶ 8. Additionally, the structure of the alleged enterprise is pled in the following language:

> Defendants Frank Conway and John Redinger conducted the affairs of the enterprise by managing DialAmerica's account with MetTel and other customers, supervising and monitoring DialAmerica's TSRs assigned to those accounts, and preparing and transmitting or mailing fraudulent reports and invoices from

DialAmerica to MetTel and other customers or causing such fraudulent reports and invoices to be prepared and transmitted or mailed. Defendant Art Conway conducted the affairs of the enterprise by directing the marketing and billing practices of DialAmerica and causing fraudulent reports and invoices to be prepared and transmitted or mailed to MetTel and other customers of DialAmerica.

*Id.* ¶ 6(c).

The alleged enterprise is a veiled attempt to bypass the distinctness requirement and to hold DialAmerica—ostensibly, the deep pocket defendant—liable as a RICO person.[4] *See R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, No. 93 Civ. 8571, 1997 WL 27059, at *8 n. 8 (S.D.N.Y. Jan. 23, 1997) ("The allegation that the plaintiffs were part of an associated-in-fact enterprise to defraud themselves is a transparent conclusory allegation that the Court is not bound to accept even on a motion to dismiss."). The alleged enterprise has no "organizational pattern or system of authority", *Pavlov*, 135 F.Supp.2d at 430, other than that embedded in the organization of DialAmerica. *See Goldfine*, 118 F.Supp.2d at 401 (dismissing RICO claim because, in part, "[p]laintiffs fail to allege any chain of command of the enterprise, or how, if at all[,] the alleged 'members' functioned as an integrated group or directed the affairs of the alleged enterprise apart from the predicate acts themselves."). Plaintiff has failed to allege a single fact that demonstrates that DialAmerica, MetTel and other unknown customers of DialAmerica have united together to "function as a continuing unit" that has an actual existence,

organization, and structure. *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524.

■ Moreover, the alleged purpose of the enterprise underscores that it is a fiction created by plaintiff to circumvent the distinctness requirement. According to plaintiff's RICO Statement, the purpose of the enterprise "is for MetTel and other customers to receive telemarketing sales services from DialAmerica and for DialAmerica to be compensated for its services at rates set by contract." RICO Statement ¶ 6(b). It is apparent, however, that this purpose is the business of DialAmerica. MetTel, DialAmerica, and DialAmerica's customers are no more united in an enterprise than any vendor and its customers. *See First Nationwide Bank v. Gelt Funding Corp.*, 820 F.Supp. 89, 98 (S.D.N.Y.1993) (dismissing association-in-fact enterprise consisting of mortgage broker and different borrowers who had engaged in a series of unrelated loan transactions because plaintiff failed to specify the structure or personnel of the enterprise or how the various defendants came together as a group); *Cullen v. Paine Webber Group, Inc.*, 689 F.Supp. 269, 273 (S.D.N.Y.1988) (clients of broker-plaintiffs did not constitute an enterprise "any more than would, for example, a stamp collection" because "[t]he clients of the broker-plaintiffs did not share a common purpose or associate together; their only link was their broker"). Indeed, plaintiff's allegation that it is associated in an enterprise with DialAmerica is belied by its contract, which explicitly states that the relationship between MetTel and DialAmerica "is solely that of independent contractors," not "employer/employee, franchisor/franchisee, agent/principal, partners, joint venturers, co-owners, or otherwise as participants in

---

**4.** Indeed, in its original complaint, plaintiff alleged that the RICO enterprise consisted only of DialAmerica and the Individual Defendants, *see* Complaint ¶ 48, thereby running afoul of the distinctness requirement. *See Riverwoods*, 30 F.3d at 344.

a joint or common undertaking." 4/5/99 Metropolitan Telecommunications Sales Authorization Agreement, Ex. A to 4/12/01 Verification of John Redinger ¶ 6.1.[5] *Cf. Medallion TV Enters. v. SelecTV of Cal., Inc.*, 627 F.Supp. 1290, 1295 (C.D.Cal.1986) (plaintiff adequately pled enterprise by alleging that it entered into joint venture with defendant), *aff'd*, 833 F.2d 1360 (9th Cir.1987).

In short, while plaintiff's alleged enterprise is creative, no amount of artful pleading can create an enterprise out of such a loose connection of separate and independent business entities.[6] To construe the RICO statute to embrace plaintiff's alleged enterprise would broaden its scope far beyond anything Congress ever imagined. Plaintiff's proposed interpretation of the statute would essentially delete the enterprise element from the statute as every company would become a potential RICO "person" associated in an enterprise with

its customers. Accordingly, plaintiff's RICO claim is dismissed.[7]

## B. Supplemental Jurisdiction

Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state law claims where "the district court has dismissed all claims over which it has original jurisdiction." Because plaintiff's RICO claim—its only federal claim—cannot survive dismissal, I decline to exercise supplemental jurisdiction over plaintiff's claims of common law fraud or breach of contract. *See Martinez v. Simonetti*, 202 F.3d 625, 636 (2d Cir.2000) (directing dismissal of supplemental state law claims where no federal claims remained).[8]

## IV. CONCLUSION

For the reasons stated above, defendants' motion to dismiss the Amended

---

**5.** Although not attached as an exhibit, the contract between MetTel and DialAmerica is quoted in the Amended Complaint, *see* Am. Compl. ¶¶ 75, 76, and is essential to plaintiff's breach of contract claim. Therefore, it is necessarily incorporated in the Amended Complaint and can be properly considered by this Court as part of the pleadings. *See Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) (finding that documents referred to or incorporated in the complaint may properly be considered by the district court, even if those documents are not attached as exhibits).

**6.** I do not suggest that a victim of racketeering activity can never unite with a RICO "person" to form an enterprise. Indeed, this very question has deeply divided the circuit courts of appeals as well as the district courts. *Compare Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258, 266–67 (3d Cir.1995) (rejecting claim that corporation can be the enterprise victimized by the racketeering activities of the defendant "persons"), *with Shapo v. Engle*, No. 98 C 7909, 1999 WL 1045086, at *8–*9 (N.D.Ill. Nov. 12, 1999) (disagreeing with *Jaguar Cars* ), *Hansel 'N*

*Gretel Brand, Inc., Savitsky*, No. 94 Civ. 4027, 1997 WL 543088, at *3 (S.D.N.Y. Sept. 3, 1997) (disagreeing with *Jaguar Cars* ), *and Com–Tech Assoc. v. Computer Assoc. Int'l*, 753 F.Supp. 1078, 1088 (E.D.N.Y.1990) ("Even though the plaintiffs themselves are also the 'enterprise', it is permissible for the victimized enterprise to sue for damages under RICO, so long as it is alleged that the *defendants* conducted the enterprise through a pattern of racketeering activity.") (emphasis in original). Because plaintiff has not adequately pled the existence of an enterprise, the question of whether a plaintiff-victim may be a member of the enterprise need not be addressed or decided.

**7.** Because the RICO claim is deficient for failure to adequately plead an enterprise, it is unnecessary to reach the merits of defendants' other grounds for dismissal of the RICO claim.

**8.** Because this Court declines to exercise supplemental jurisdiction over plaintiff's state law claims, it is unnecessary to reach the merits of those claims.

Complaint is granted. The Clerk of the Court is directed to close this case.

SO ORDERED.